William L. **DAWSON,**
Plaintiff–Appellant,

v.

**HINSHAW MUSIC INC.;** Gilbert M. Martin, Defendants–Appellees.

No. 89–2643.

United States Court of Appeals, Fourth Circuit.

Argued Dec. 5, 1989.

Decided June 7, 1990.

Marvin William Krasilovsky, Feinman & Krasilovsky, P.C. (argued), New York City, Philip C. Baxa, Mays and Valentine, on the brief, Richmond, Va., for plaintiff-appellant.

Robert Allen Monath, Lewis & Anderson, P.C. (argued), Chapel Hill, N.C., Susan H. Lewis, Lewis & Anderson, P.C., Chapel Hill, N.C., Marion G. Follin, III, Smith, Patterson, Follin, Curtis, James & Harkavy, Greensboro, N.C., on the brief, for defendants-appellees.

Before ERVIN, Chief Judge, and MURNAGHAN and WILKINS, Circuit Judges.

MURNAGHAN, Circuit Judge:

## I

William L. Dawson possesses a valid copyright of an arrangement of the spiritual "Ezekiel Saw De Wheel." Dawson, over the years, has sold many copies of his arrangement. In 1980, Gilbert M. Martin composed an arrangement of the spiritual. That same year, Martin granted Hinshaw Music, Inc. ("Hinshaw"), the exclusive rights to publish, distribute, and sell his arrangement. Martin agreed to indemnify Hinshaw for any loss resulting from infringement of copyright. Dawson brought suit against Hinshaw and Martin, alleging copyright infringement under 17 U.S.C. §§ 501 *et seq.* After a bench trial, the district court held for the defendants.

The district court began its analysis by correctly noting that, because of the difficulties in proving copyright infringement by direct evidence, the law has established a burden shifting mechanism whereby plaintiffs can establish a *prima facie* case of infringement by showing possession of a valid copyright, the defendant's access to the plaintiff's work, and substantial similarity between the plaintiff's and defendant's works. *See Concrete Machinery Co. v. Classic Lawn Ornaments, Inc.,* 843 F.2d 600, 606 (1st Cir.1988); *Whelan Associates v. Jaslow Dental Laboratory,* 797 F.2d 1222, 1232 (3d Cir.1986); *Walker v. Time Life Films,* 784 F.2d 44, 48 (2d Cir. 1986); *Litchfield v. Spielberg,* 736 F.2d 1352, 1355 (9th Cir.1984); *Original Appalachian Artworks v. Toy Loft,* 684 F.2d 821, 829 (11th Cir.1982); *Atari, Inc. v. North American,* 672 F.2d 607, 614 (7th Cir.), *cert. denied,* 459 U.S. 880, 103 S.Ct. 176, 74 L.Ed.2d 145 (1982). The district court found that Dawson successfully established (a) the validity of his copyright and (b) Martin's access to his arrangement. What remained for Dawson was the establishment of the substantial similarity between the two works.

As correctly noted by the district court, there are two prongs to the substantial similarity inquiry. The plaintiff must establish substantial similarity of both the ideas of the two works and of the expression of those ideas.[1] *See, e.g., Litchfield,*

---

1. Some courts use a different set of labels for the two-prong inquiry, referring to the first prong as establishment of copying and the second prong as establishment of illicit appropriation. *See, e.g., Concrete Machinery,* 843 F.2d at 608; *Whelan,* 797 F.2d at 1232; *Atari,* 672 F.2d at 614. The difference in labels need not concern us because the apparent consensus as to the nature of the tests applicable to each prong of the substantial similarity inquiry smooths

736 F.2d at 1356. It is well established that expert testimony is admissible for proof under the first prong which courts have referred to as an "extrinsic" or "objective" inquiry. *See id.* The district court accordingly admitted expert testimony on Dawson's proof that the idea of Martin's work was substantially similar to the idea of Dawson's work. The court concluded that "the pattern, theme and organization of [Dawson's] arrangement is unique among any other arrangement of this spiritual." The court further found that "there are substantial similarities between [Dawson's] and [Martin's] arrangements regarding this unique pattern." The district court therefore found for Dawson on the first prong of the substantial similarity inquiry. Thus, if Dawson could satisfy the second prong of the substantial similarity test, he would have made out a *prima facie* case of copyright infringement.

However, the district court ruled against Dawson on the second prong of the substantial similarity inquiry, holding that Dawson had not shown that the expression of ideas in Martin's work was substantially similar to the expression of ideas in Dawson's work. The court applied what has come to be known as the ordinary observer test, sometimes referred to as an "intrinsic" or "subjective" test, inquiring into the "total concept and feel" of the works *without* the aid of expert testimony. *See, e.g., Litchfield,* 736 F.2d at 1356; *Concrete Machinery,* 843 F.2d at 608. More specifically, the court interpreted the ordinary observer test to be an ordinary *lay* observer test, which imposed upon Dawson the obligation to prove to a *lay* observer that the expression of ideas in the works was substantially similar. Other than the expert testimony used in evaluating the extrinsic similarity of the two works, the only evidence on substantial similarity was the sheet music of the two arrangements. Dawson had not presented recordings of performances of the two arrangements. The district court found that, as an ordinary *lay* observer, with nothing before him other than the sheet music, he could not

over, as a practical matter, underlying differ-

determine that the two works were substantially similar. It is the district court's holding as to the second prong of the substantial similarity test that we now examine.

## II

We direct our attention to the district court's characterization of the ordinary observer test as an ordinary *lay* observer test. We are well aware of the existence of that characterization in the case law. However, as demonstrated below, obedience to the undisputed principles of copyright law and the policy underlying the ordinary observer test requires a recognition of the limits of the ordinary *lay* observer characterization of the ordinary observer test. Those principles require orientation of the ordinary observer test to the works' intended audience, permitting an ordinary *lay* observer characterization of the test only where the lay public fairly represents the works' intended audience.

## A

*Arnstein v. Porter,* 154 F.2d 464 (2d Cir.1946), provides the source of modern theory regarding the ordinary observer test. *Arnstein* involved the alleged infringement of a popular musical composition. Writing for the panel, Judge Jerome Frank first explained that "the plaintiff's legally protected interest is not, as such, his reputation as a musician but his interest in the potential financial returns from his compositions which derive from the lay public's approbation." *Id.* at 473. This initial observation gave force to the recognized purpose of the copyright laws of providing creators with a financial incentive to create for the ultimate benefit of the public. *See Mazer v. Stein,* 347 U.S. 201, 219, 74 S.Ct. 460, 471, 98 L.Ed. 630 (1954) ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and the useful Arts.' Sacri-

ences in the inquiry's two characterizations.

ficial days devoted to such creative activities deserve rewards commensurate with the services rendered."); *see also* Note, *The Role of the Expert Witness in Music Copyright Infringement Cases*, 57 Fordham L.Rev. 127, 132 (1988) [hereinafter *Role of the Expert Witness* ] ("Under *Arnstein*, an action for infringement of a music copyright serves to compensate the plaintiff for the deprivation of potential financial returns that results from the defendant's copying"); Note, *Copyright Infringement Actions: The Proper Role for Audience Reactions in Determining Substantial Similarity*, 54 S.Cal.L.Rev. 385, 392 (1981) [hereinafter *Role for Audience Reactions* ] ("[C]opyright protection does not exist for the gratification of the artist's ego; it exists for the gratification of the artist's pocketbook.").

Consistent with its economic incentive view of copyright law, the *Arnstein* court concluded that "the question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the ears of lay listeners, *who comprise the audience for whom such popular music is composed,* that defendant wrongfully appropriated something which belongs to plaintiff." 154 F.2d at 473 (emphasis added). Thus, under *Arnstein*, a court should look to the reaction of "lay listeners," because they comprise the audience of the plaintiff's work. The lay listener's reaction is relevant because it gauges the effect of the defendant's work on the plaintiff's market. *See* Note, *Defining the Scope of Copyright Protection for Computer Software*, 38 Stan.L.Rev. 497, 514 (1986) ("The total concept and feel of ordinary literary works is relevant because it is the basis on which potential purchasers of the work identify and choose them. If one work appears similar to another in the eyes of the ordinary lay observer, it is likely to appear the same to most consumers, and its adverse effect on demand for the protected work is cause to proscribe it."); *see also Role for Audience Reactions* at 393 ("it is the actual audience, and not some obscure notion of an average reasonable person, that provides the artist with the economic incentive to create").

Although *Arnstein* established a sound foundation for the appeal to audience reaction, its reference to "lay listeners" may have fostered the development of a rule that has come to be stated too broadly. Under the facts before it, with a popular composition at issue, the *Arnstein* court appropriately perceived "lay listeners" and the works' "audience" to be the same. However, under *Arnstein*'s sound logic, the lay listeners are relevant only because they comprise the relevant audience. Although *Arnstein* does not address the question directly, we read the case's logic to require that where the intended audience is significantly more specialized than the pool of lay listeners, the reaction of the intended audience would be the relevant inquiry. In light of the copyright law's purpose of protecting a creator's market, we think it sensible to embrace *Arnstein*'s command that the ultimate comparison of the works at issue be oriented towards the works' intended audience.

Our reading of *Arnstein* brings our analysis into line with *Sid & Marty Krofft Television v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir.1977), another landmark case involving questions of substantial similarity. *Krofft* announced that the test for determining substantial similarity in the expression of ideas of two works "shall be labeled an intrinsic one—depending on the response of the ordinary reasonable person." *Id.* at 1164. *Krofft* relied upon *Arnstein* and upon language from *Twentieth Century–Fox Film Corp. v. Stonesifer*, 140 F.2d 579 (9th Cir.1944), which directed the court's attention to "the observations and impressions of the average reasonable *reader and spectator.*" *Id.* at 582 (emphasis added). When applying its intrinsic test, the *Krofft* court noted the particular audience to which the works in question were directed. The court wrote:

The present case demands an even more intrinsic determination because both plaintiff's and defendants' works are directed to an audience of children. *This raises the particular factual issue of the impact of the respective works upon*

*the minds and imaginations of young people.*

562 F.2d at 1166 (emphasis added). Thus, the *Krofft* court believed that the perspective of the specific audience for which the products were intended (children) was the relevant perspective for the ordinary observer test. *See also Aliotti v. R. Dakin & Co.*, 831 F.2d 898, 902 (9th Cir.1987) ("Because children are the intended market for the dolls, we must filter the intrinsic inquiry through the perception of children."). The Seventh Circuit adopted a similar position in *Atari*, 672 F.2d at 619, in which it held that differences in the products there at issue must be viewed from the perspective of the child audience for which the products were intended.

We suspect that courts have been slow to recognize explicitly the need for refining the ordinary observer test in such a way that it would adopt the perspective of the intended audience because, in most fact scenarios, the general lay public fairly represents the works' intended audience. As a result, "a considerable degree of ambiguity exists in this area; courts have not always made it apparent whether they were using a member of a specific audience, or simply an average lay observer as their spectator." *Role for Audience Reactions* at 386. Fortunately, the advent of computer programming infringement actions has forced courts to recognize that sometimes the non-interested or uninformed lay observer simply lacks the necessary expertise to determine similarities or differences between products. In *Whelan Associates v. Jaslow Dental Laboratory*, 797 F.2d 1222 (3d Cir.1986), *cert. denied*, 479 U.S. 1031, 107 S.Ct. 877, 93 L.Ed.2d 831 (1987), the Third Circuit concluded that the ordinary observer arm of the substantial similarity test was not appropriate for the complex computer program copyright case before it. Writing for a unanimous panel, Judge Becker reasoned that the complexity of computer programs, combined with the general public's unfamiliarity with such programs, rendered the ordinary observer test senseless. He further reasoned that where the finder of fact is the same for both the extrinsic and intrinsic tests, it seems silly to ask the finder of fact to "forget" the expert testimony when considering similarity of expression. Judge Becker relied also on Federal Rule of Evidence 702, which permits expert testimony where it will be useful to a trier of fact. 797 F.2d at 1232–33. *See also* Comment, *The Incompatibility of Copyright and Computer Software: An Economic Evaluation and a Proposal for a Marketplace Solution*, 66 N.C.L.Rev. 977, 985 (1988) (in software cases, courts have generally abandoned a bifurcated approach to substantial similarity, using an integrated expert/lay test instead). *But see Manufacturers Technologies, Inc. v. CAMS, Inc.*, 706 F.Supp. 984, 1000–01 (D.Conn. 1989) (applying lay observer test to computer case).

We believe the *Whelan* analysis further supports our view. As *Whelan* reveals, only a reckless indifference to common sense would lead a court to embrace a doctrine that requires a copyright case to turn on the opinion of someone who is ignorant of the relevant differences and similarities between two works. Instead, the judgment should be informed by people who are familiar with the media at issue. *See* Note, *Whelan Associates v. Jaslow Dental Laboratory: Copyright Protection for the Structure and Sequence of Computer Programs*, 21 Loy.L.A.L.Rev. 255, 294 (1987).

In addition to conforming to the policy underlying the ordinary observer test and the doctrine that has developed for child product and computer cases, our view that the ordinary observer inquiry must adopt the perspective of the works' intended audience finds abundant direct support in the copyright literature. For example, our conclusion tracks closely the thesis of *Role of Audience Reactions*, which argues that a precise audience test should replace the average lay observer test which is "obsolete when dealing with works aimed at a distinguishable audience group." The note intelligently observes:

> [I]n cases dealing with works of broad public appeal, the best representative of the audience may in fact be the average

lay person. But in all other cases identification of the audience, and the subsequent decision about whether to narrow the group of average lay observers to this particular audience, should enter into the determination of substantial similarity.

*Id.* at 387. Another commentary has noted:

> If, as *Arnstein* suggested, copyright law should protect the plaintiff's interest in potential financial returns, the ultimate test for infringement should consider specifically the response of the market from which those returns would derive.

*Role of the Expert Witness* at 144–45. Still another has written:

> Most often courts speak of the ordinary observer test. This [commentary] adopts the audience test for terminology to emphasize the fact that when a work appeals to a particular audience, its reaction is a more valid indicator of substantial similarity than that of the ordinary observer.

*Recent Development*, 36 Vand.L.Rev. 1277, 1290 n. 91 (1983). Professor Nimmer has described the law as being, "If the works in issue are directed to a particular audience, then the 'spontaneous and immediate' reaction of that audience is determinative." 3 M. Nimmer & D. Nimmer, *Nimmer on Copyright* § 13.03[E], at 13–62.4 n. 202 (1989). Another commentary has nicely abstracted from the computer cases the conclusion we reach in this case as follows:

> [The ordinary observer test] assumes that if the ordinary person *in the position of the intended audience for the works in question* would recognize [the two works] as substantially similar, then protectable expression has been infringed. Differences that might be discoverable with 'meticulous scrutiny' are not significant if the average member of the typical audience 'would be disposed to overlook' those differences.

(Emphasis in original.)

When dealing with computer programs, care may have to be taken in choosing the 'ordinary observer.' The average judge or jury cannot read source code or appreciate the 'total concept and feel' of a program. Thus, *it is necessary to rely on the reaction of persons who do typify the members of the intended audience.*

(Emphasis added.) Clapes, Lynch & Steinberg, *Silicon Epics and Binary Bards: Determining the Proper Scope of Copyright Protection for Computer Programs*, 34 U.C.L.A. L.Rev. 1493, 1571 (1986–87).

B

█ Under the foregoing logic, we state the law to be as follows. When conducting the second prong of the substantial similarity inquiry, a district court must consider the nature of the intended audience of the plaintiff's work. If, as will most often be the case, the lay public fairly represents the intended audience, the court should apply the lay observer formulation of the ordinary observer test. However, if the intended audience is more narrow in that it possesses specialized expertise, relevant to the purchasing decision, that lay people would lack, the court's inquiry should focus on whether a member of the intended audience would find the two works to be substantially similar. Such an inquiry may include, and no doubt in many cases will require, admission of testimony from members of the intended audience or, possibly, from those who possess expertise with reference to the tastes and perceptions of the intended audience.

We recognize the appeal of blind adherence to the lay observer characterization of the ordinary observer test even where the intended audience possesses specialized knowledge and such adherence is therefore theoretically inappropriate. The lay observer test spares a court the burden of inquiring into, and drawing conclusions regarding, the nature of the works' intended audience. That burden would be a substantial one if our holding were read as an invitation to every litigant in every copyright case to put before the court the seemingly unanswerable question of whether a product's audience is sufficiently specialized to justify departure from the lay characterization of the ordinary observer test.

Although the existence of difficulties attendant to application of a test that a doctrine compels is an insufficient reason not to use the test, concerns about copyright actions becoming unwieldy are legitimate.

■ We therefore believe that, in any given case, a court should be hesitant to find that the lay public does not fairly represent a work's intended audience. In our opinion, departure from the lay characterization is warranted only where the intended audience possesses "specialized expertise." We thereby pay heed to the need for hesitancy when departing from the indiscriminately selected lay public in applying the test. To warrant departure from the lay characterization of the ordinary observer test, "specialized expertise" must go beyond mere differences in taste and instead must rise to the level of the possession of knowledge that the lay public lacks.

We believe that, especially given the explicitness of our holding, "intended audience" should supplant "ordinary observer" as the label for the appropriate test. The new label is appropriate not because we have changed the test, but because the imprecision of the old label leads to application of an ordinary lay observer test even where such a test is inappropriate. However, mindful of the harm that has resulted from reliance upon labels in this doctrinal area, we emphasize that our clarification of the doctrine is motivated by the policies underlying the doctrine, namely, the theoretical propriety of looking to the effect of the defendant's work on the plaintiff's market and the practical evil of having an unaided uninformed finder of fact deciding the crucial issue in a case. We intend to make the rule more precise, not to change it.

### III

■ In light of our statement of the law in Section II, we think remand is necessary because the district court did not inquire into whether the audience of Dawson's work possessed specialized expertise that the lay public lacks and, therefore, whether the general, undifferentiated lay public fairly represents the intended audience of Dawson's arrangement. It is true that the case with which we contend involves music and courts routinely, and properly, apply the ordinary lay observer test to music cases. *See, e.g., Baxter v. MCA*, 812 F.2d 421, 424 n. 2 (9th Cir.1987) (rejecting, in *dictum*, in the context of recordings to be used as a popular movie soundtrack, the proposition that the mere fact that a case involves music requires departure from the lay observer test). However, Dawson alleged infringement of a spiritual arrangement, not a popular recording. We suspect that the distinction may have implications for the determination of the intended audience of Dawson's work. It may be that a popular recording of a love ditty pitched at the broadest of audiences is marketed to the general public far more so than is a spiritual arrangement. It is quite possible that spiritual arrangements are purchased primarily by choral directors who possess specialized expertise relevant to their selection of one arrangement instead of another. Whereas a lay person's reaction may be an accurate indicator of the extent to which those in the market for a popular recording will perceive another recording to be substantially similar, a lay person's reaction might not be an accurate indicator of how expert choral directors would compare two spiritual arrangements.

■ Given the need to measure substantial similarity by the reaction of the ordinary observer within the intended audience, Dawson's failure to enter into evidence recordings of performances of the two arrangements is not fatal to his case. Use of a recording is obviously appropriate where a plaintiff sells recordings for the public to buy. However, Dawson does not sell recordings. He apparently sells sheet music arrangements to those who may make a purchasing decision on the basis of the sheet music. Although the district court's heavy reliance upon Dawson's failure to present a recording of the arrangements made sense in light of its application of the ordinary lay observer test, the conclusion would not make sense if it were the case that the audience for Dawson's spiritual arrangement had specialized expertise rele-

vant to its purchasing decision. There is no reason for Dawson to submit recordings to persuade a lay listener that the arrangements are substantially similar if the lay listener's conclusion would not reflect the response of the choral directors who would purchase one arrangement over another on the basis of the arrangement's sheet music.

Furthermore, it may be that recordings of performances of the arrangements would not only be irrelevant but could indeed hinder the relevant inquiry. It may be that the sound of the performance of an arrangement is a function of not only the arrangement itself, but of the choral director's interpretation of the arrangement. Thus, differences and similarities in the sound of performances of two arrangements may represent something other than differences and similarities in the arrangements themselves. In addition, comparison of two recordings of performances of the arrangements would fail to take account of the different interpretations to the arrangements that purchasers intended to inject, rendering such a comparison even more misleading. These problems, of course, are not presented when actual recordings are at issue and therefore further distinguish the problems posed by spiritual arrangements as compared to popular recordings.

The district court did not make explicit factual findings on the issues of what the intended audience was and whether members of that audience have specialized expertise relevant to their purchasing decision. We offer our suspicions merely as explanations for why remand is necessary, not as predictions of the outcome of factual inquiry. Therefore, we decline to remand with instructions that the district court define an audience distinct from the ordinary lay observer. Instead, we remand with instructions that the district court determine whether definition of a distinct audience is appropriate in this case. Assuming such a definition is appropriate, the district court should then take additional evidence to determine whether members of the intended audience would find the arrangements to be substantially similar.

The facts of this case present a particularly inviting context in which to refine the ordinary observer test by requiring that the ordinary observer be the intended audience. To say the least, Dawson's claim is not bogus. The district court found extensive similarities between Dawson's and Martin's works. The logic of traditional copyright doctrine, as reflected in the case law and the consensus of the commentaries that have addressed the matter, compels our result. To hold otherwise would be to allow the imprecise "ordinary lay observer" label to effect a betrayal of the fundamental purposes of copyright doctrine and the substantial similarity test.