Filed:  March 20, 1996

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____

No. 94-1147
(CA-93-704-A)

_____

Virginia L. Towler,

Plaintiff - Appellant,

versus

John Sayles, et al,

Defendants - Appellees.

_____

O R D E R

_____

The Court amends its opinion filed February 23, 1996, as follows:

On page 7, third full paragraph, line 11 -- the sentence that begins "The total concept" will now begin the fourth paragraph on page 7.

For the Court - By Direction

/s/ Bert M. Montague
_____
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

VIRGINIA L. TOWLER,
Plaintiff-Appellant,

v.

JOHN SAYLES; ATCHAFALAYA FILMS,
INCORPORATED; ESPERANZA,
INCORPORATED; MIRAMAX FILM
CORPORATION,

No. 94-1147

Defendants-Appellees,

and

SCS COMMUNICATIONS,
INCORPORATED,
Defendant,

TRACY STRAIN,
Party in Interest.

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-93-704-A)

Argued: July 11, 1995

Decided: February 23, 1996

Before MURNAGHAN, Circuit Judge, and BUTZNER and
PHILLIPS, Senior Circuit Judges.

_____

Affirmed by published opinion. Senior Judge Butzner wrote the opin-
ion, in which Judge Murnaghan and Senior Judge Phillips joined.

_____

**COUNSEL**

**ARGUED:** James Phillip Chandler, III, CHANDLER & ROBERT-SON, Washington, D.C., for Appellants. Michael Dennis Sullivan, ROSS, DIXON & MASBACK, Washington, D.C., for Appellees. **ON BRIEF:** Elizabeth C. Koch, Jay Ward Brown, ROSS, DIXON & MASBACK, Washington, D.C., for Appellees.

---

**OPINION**

BUTZNER, Senior Circuit Judge:

In an action for infringement of copyright, Virginia Towler appeals from the district court's grant of judgment as a matter of law to John Sayles, Atchafalaya Films, Inc., Esperanza, Inc., and Miramax Film Corporation. Because we find that Towler did not present sufficient evidence showing that Sayles infringed her copyright, we affirm.

Virginia Towler wrote the screenplay, "Crossed Wires or Bobbie and Wendy were Neighbors" ("Crossed Wires"), which she copyrighted in 1990. John Sayles wrote and directed "Passion Fish," which he initially called "The Louisiana Project." Towler became aware of Sayles' screenplay when it was shown throughout the country in 1992.

Alleging numerous similarities between "Passion Fish" and "Crossed Wires," Towler brought suit for infringement of copyright and for violations of the Lanham Act and the Virginia unfair competition laws. The district court dismissed one of the defendants, SCS Communications, Inc., before trial. It also dismissed the Lanham Act and unfair competition law claims. Towler has not appealed these rulings. At the close of Towler's evidence in the trial of the copyright infringement claim, the district court determined that the evidence was insufficient to show access and substantial similarity, and it granted the defendants' motion for judgment as a matter of law. Towler appealed, assigning error to the court's ruling with respect to both access and similarity.

2

I

Judgment as a matter of law is appropriate when "a party has been fully heard . . . and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party." Fed. R. Civ. P. 50(a)(1). On appeal, we evaluate the sufficiency of the evidence de novo, while viewing the facts and drawing all reasonable inferences in favor of the nonmoving party. Trandes Corp. v. Guy F. Atkinson Co., 996 F.2d 655, 660-61 (4th Cir. 1993).

To prove copyright infringement, a plaintiff must show first that she owned the copyright to the work that was allegedly copied, and second, that the defendant copied protected elements of that work. Feist Publications, Inc. v. Rural Telephone Service Co., 499 U.S. 340, 361 (1991). Here, it is undisputed that Towler possesses a valid copyright to "Crossed Wires."

At issue is whether Towler has presented sufficient evidence to satisfy the second prong of the test--proof that Sayles copied her work. As is often the case, direct evidence of copying is lacking, making it necessary to look to circumstantial evidence. Accordingly, Towler can raise a presumption of copying by showing both that Sayles had access to "Crossed Wires" and that the two screenplays in question are substantially similar. Dawson v. Hinshaw Music Inc., 905 F.2d 731, 732 (4th Cir. 1990).

To prove access, Towler must show that Sayles had an opportunity to view or to copy her work. 3 Nimmer on Copyright § 13.02[A], at 13-16 to 13-18 (1995). A mere possibility that such an opportunity could have arisen will not suffice. Rather, it must be reasonably possible that the paths of the infringer and the infringed work crossed. Moore v. Columbia Pictures Industries, Inc., 972 F.2d 939, 942 (8th Cir. 1992).

II

In an effort to find a producer for "Crossed Wires," Towler contacted numerous individuals in the film industry. In May 1991, she phoned Cinecom Pictures in an attempt to contact Sayles, a well-

3

known independent film director and screenwriter. Because of Cinecom's involvement with the distribution of two of Sayles' previous films, Towler mistakenly assumed that Cinecom was one of Sayles' companies. In any event, after Towler asked to speak with a Cinecom representative, the telephone operator instead gave her the number for SCS Films.

The reasons why the operator referred Towler to SCS are readily explained. Facing mounting financial difficulties, Cinecom had filed for bankruptcy. Subsequently, Cinecom's chairman of the board, Steven Clark Swid, created SCS Communications, which he named after himself. SCS Communications and one of its divisions, SCS Films, occupied Cinecom's former office and employed several of the bankrupt company's personnel, including Tracy Strain and her supervisor, Shelby Stone.

After receiving SCS's phone number from the operator, Towler assumed that SCS was affiliated with Cinecom. She then called SCS and spoke with Tracy Strain. She testified that Strain told her that SCS stood for "Secaucus Seven," the title of one of Sayles' prior films. Towler took this as an affirmation of her belief that SCS was one of Sayles' companies and asked Strain to forward "Crossed Wires" to Sayles. Towler testified that Strain agreed to do so.

Shortly after speaking with Strain, Towler sent Strain a copy of "Crossed Wires" along with a follow-up letter, dated May 28, 1991. She addressed the letter to Strain at SCS Films and did not mention Sayles. Towler had no further contact with Strain or SCS, except for a letter in which SCS rejected "Crossed Wires." At no time did Towler write to Sayles directly, nor did she ever receive any correspondence from him. In excerpts from Strain's deposition that were read to the jury, Strain stated that she knew SCS stood for Steven Clark Swid. She also stated that she did not know Sayles and did not recall speaking to Towler about sending "Crossed Wires" to Sayles. Towler admitted on cross-examination that Sayles was not affiliated with either Cinecom or SCS.

Sayles, testifying as a witness called by Towler, denied knowing Strain or receiving anything from her at any time. He testified that he began researching and writing a screenplay, entitled "The Louisiana

4

Project," in January 1991, at least four months before Towler sent "Crossed Wires" to SCS on May 28, 1991. To support his testimony, he introduced numerous book receipts and other documents related to his research that were dated prior to May 28, 1991. He also testified that he spoke with Mary McDonnell in late March 1991 to find out if she was interested in acting in the film that he hoped to make from his screenplay. He introduced additional evidence showing that he was on a multi-city book tour from May 28 until June 7, 1991. During the tour, he told an interviewer that he had just given the first 80 pages of the script to a friend to read. In late 1991, Sayles sold the production rights to "The Louisiana Project." He retained the right to direct the film version, renaming it "Passion Fish." He derived this title from the name of a small fish in Louisiana that legend credits with the ability to grant the wish of a person who holds it.

Towler asserts that access is established because Strain said she would forward the screenplay to Sayles. At this stage of the proceedings, we must credit Towler's testimony that Strain said she would forward "Crossed Wires" to Sayles. But this is just the beginning, not the end, of our inquiry. Towler introduced no evidence that Strain actually sent "Crossed Wires" to Sayles. Nor has Towler introduced evidence from which a jury could draw a reasonable inference that Sayles received "Crossed Wires." This gap in the proof is enlarged by Sayles' testimony, which Towler introduced, that he never received "Crossed Wires" from Strain. Towler has presented no evidence upon which a jury could base an inference that Sayles was not truthful. Cf. Ferguson v. National Broadcasting Co., Inc., 584 F.2d 111, 113 (5th Cir. 1978).

We conclude that Towler has failed to prove a reasonable possibility that Sayles gained access to "Crossed Wires" through Towler's contact with Strain.

III

A court may infer that the alleged infringer had a reasonable possibility of access if the author sent the copyrighted work to a third party intermediary who has a close relationship with the infringer. An intermediary will fall within this category, for example, if she supervises or works in the same department as the infringer or contributes cre-

ative ideas to him. Moore, 972 F.2d at 944-45; Meta-Film Associates, Inc. v. MCA, Inc., 586 F. Supp. 1346, 1358 (C.D. Cal. 1984).

Towler contends that Strain and Stone, along with a number of named and unnamed individuals in the film industry, all satisfy the definition of an intermediary, thereby permitting the inference of access. With regards to Strain, Towler's primary argument is that Strain expressed interest in the screenplay and told her she would send it to Sayles. Stone is implicated because she supervised Strain at SCS and worked with Sayles previously when Cinecom distributed two of his films. As further evidence of Stone's continuing relationship with Sayles, Towler points to the fact that Sayles' business attorney, John Sloss, had worked for Cinecom and knew Stone socially. Towler concludes her argument by naming a host of individuals connected with film production who received the screenplay from Towler and who presumably could have sent the work to Sayles.

Towler's speculative reasoning is wholly unpersuasive. First, with regards to Strain and Stone, there is no evidence that either of them, or SCS generally, had any contact with Sayles during the period that he was working on "Passion Fish." In fact, Sayles' uncontroverted testimony was that he has never dealt with SCS. We will not infer access simply because Sayles worked with SCS's predecessor, Cinecom, on unrelated projects several years before Towler sent "Crossed Wires" to SCS. "[A]t a minimum, the dealings between the intermediary and the alleged copier must involve some overlap in subject matter to permit an inference of access." Meta-Film Associates, 586 F. Supp. at 1358.

Second, Towler's arguments regarding various individuals in the film industry who supposedly forwarded the screenplay to Sayles are without merit. Aside from unsatisfactory speculation and conjecture based on Sayles' prominence in the film industry, Towler failed to present any evidence showing that Sayles had a reasonable opportunity to view "Crossed Wires" while it was in the possession of these individuals. She also introduced no evidence demonstrating that any of these people qualified as third party intermediaries. The "tortious chain of hypothetical transmittals" that Towler attempts to forge is insufficient to infer access. See Meta-Film Associates, 586 F.Supp. at 1355.

6

IV

Even if access were to be inferred, Towler would also have to show that "Crossed Wires" is substantially similar to Sayles' composition. Proving substantial similarity requires a two-part analysis. First, a plaintiff must show--typically with the aid of expert testimony--that the works in question are extrinsically similar because they contain substantially similar ideas that are subject to copyright protection. Second, a plaintiff must satisfy the subjective, or intrinsic, portion of the test by showing substantial similarity in how those ideas are expressed. Dawson, 905 F.2d at 732-33. This portion of the test considers whether the intended audience could determine that the works are substantially similar, usually without the aid of expert testimony. Dawson, 905 F.2d at 736-37. In this case, the intended audience is the movie-going public.

Towler called one expert witness, Dr. Mark Reid, who catalogued an extensive array of alleged similarities between "Crossed Wires" and "Passion Fish," including characters, dialogue, plot, and setting. Towler supplements his testimony with a detailed chart that compares fragments of dialogue.

We believe that a list comparing "random similarities scattered throughout the works" is "inherently subjective and unreliable." Litchfield v. Spielberg, 736 F.2d 1352, 1356 (9th Cir. 1984). Instead, a court must analyze both screenplays and the record, searching for extrinsic similarities such as those found in plot, theme, dialogue, mood, setting, pace, or sequence. The only similarity shared by the two screenplays is that they both have a black female character and a white female character who are friends. But Towler cannot copyright such a general idea. Nimmer on Copyright § 13.03[B], at 13-68. Our examination disclosed that "Passion Fish" and "Crossed Wires" are not extrinsically similar.

The total concept and feel of "Crossed Wires" and "Passion Fish" is also completely different, rendering the works intrinsically dissimilar. See Dawson, 905 F.2d at 733. When sending her screenplay to agents and producers, Towler included a form letter that aptly summarized the issues highlighted in "Crossed Wires":

> Bobbie is a black lawyer. Wendy is a white babysitter. Howard is Bobbie's husband. Harold is Wendy's husband. They

7

are next door neighbors. Wendy fantasizes about black men. Howard fancies himself a white man. Harold doesn't like Howard. Howard doesn't like Harold. Bobbie and Wendy like each other. ABC, a black construction worker, likes Wendy and Bobbie. Bobbie is trying to make sense of it all.

This screenplay highlights a weekend in the friendship of the two women--their alienation and discovery. It also satirizes the ever-important role that the telephone plays in entangling their mundane lives. Although it appears to be farcical, this screenplay will also encourage healthy discussion about race relationships and friendship. In all its emphasis on the two women, the screenplay actually serves as a vehicle to address the plight of the American black male in a country that does not fully understand him.

The play takes place in suburbia. Wendy flirts with Howard, Bobbie's husband. Bobbie commits adultery with ABC. The play ends with Wendy and Harold reconciling and Bobbie planning to desert Howard to be with ABC.

In comparison, "Passion Fish" is a bittersweet, yet frequently humorous, story about the growing friendship between two women-- Mae-Alice, who is white, and Chantelle, who is black. Mae-Alice, a successful soap opera actress, is struggling to cope with the changes in her life brought on by an automobile accident that left her a paraplegic. She has returned from New York to her childhood home in the Louisiana bayou country, where she is becoming an alcoholic recluse. Her attendant, Chantelle, is a recovering drug addict who is trying to make peace with her past and regain custody of her daughter. Gradually the two women reinforce each other. Chantelle encourages Mae-Alice to stop drinking, and Mae-Alice gives Chantelle self-confidence by assuring her steady employment. Chantelle has an affair with Sugar, a man who befriends her. Mae-Alice emerges from her self-pity by engaging in a new hobby, photography, and by renewing her acquaintance with a childhood friend. Together the two women reshape their lives.

We conclude that no member of the public reading or viewing the screenplays could reasonably decide that the two works are substantially similar.

8

V

Citing <u>Gaste v. Kaiserman</u>, 863 F.2d 1061, 1067-68 (2d Cir. 1988), Towler contends that she can prevail on the theory that proof of striking similarity establishes infringement without the necessity of showing access. <u>Accord Ferguson</u>, 584 F.2d at 113; <u>contra Selle v. Gibb</u>, 741 F.2d 896, 901 (7th Cir. 1984); <u>see generally</u> 3 <u>Nimmer on Copyright</u> § 13.02[B] at 13-23 to 13-27. We need not, however, join this debate, for Towler did not prove striking similarity between "Crossed Wires" and "Passion Fish." Both <u>Gaste</u>, 863 F.2d at 1068, and <u>Ferguson</u>, 584 F.2d at 113, require proof of striking similarity that precludes the "possibility of independent creation." For reasons explained in Part IV, it is apparent that Towler's evidence does not even approach this exacting standard.

<u>AFFIRMED</u>

9