RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2003 FED App. 0150P (6th Cir.)
File Name: 03a0150p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LOUIS M. KOHUS,
     *Plaintiff-Appellant,*

    *v.*

JOHN V. MARIOL; JAMES F.
MARIOL; JVM INNOVATION &
DESIGN,
    *Defendants-Appellees.*

No. 01-4089

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 99-00831—Sandra S. Beckwith, District Judge.

Argued: December 12, 2002

Decided and Filed: May 20, 2003

Before: BATCHELDER and MOORE, Circuit Judges;
FORESTER, Chief District Judge.*

_____

    *The Honorable Karl S. Forester, Chief United States District Judge for the Eastern District of Kentucky, sitting by designation.

_____

## COUNSEL

**ARGUED:** Donald J. Rafferty, COHEN, TODD, KITE & STANFORD, Cincinnati, Ohio, for Appellant. Michael D. Johns, DINSMORE & SHOHL, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Donald J. Rafferty, COHEN, TODD, KITE & STANFORD, Cincinnati, Ohio, for Appellant. Michael D. Johns, Charles H. Brown III, DINSMORE & SHOHL, Cincinnati, Ohio, for Appellees.

_____

## OPINION

_____

    ALICE M. BATCHELDER, Circuit Judge. Louis Kohus ("Kohus") appeals the district court's grant of summary judgment in favor of defendants John Mariol, James Mariol, and JVM Innovation & Design ("Defendants"), on Kohus's claims for copyright infringement. Kohus argues that the district court applied the wrong legal standard, and that the court erred by refusing to consider expert testimony. Having concluded that the Sixth Circuit does not have a settled legal standard in this area, we set out a standard below and remand so the district court may apply that standard.

### Statement of Facts

    Kohus invents and designs consumer products, including children's items. In 1987 he formed Kohus/Mariol, Inc. ("KMI") with John Mariol ("Mariol"). They developed a number of products, including product 11-KMI86, a portable children's playyard, which included drawings for a latch that would lock the upper rails in place for use. This latch ("the 11-KMI86 latch") was unlike others on the market in that it had two flippers, or hinges, instead of one, and this gave it a two-step function that could make it safer than comparable latches.

By August of 1988 a serious disagreement had developed between KMI's shareholders, and Kohus and KMI sued Mariol and his father James (who was also an inventor, and worked with Kohus) in Ohio court. The lawsuit remained unresolved for some six years, though the court did order that in the interim James should maintain control of all KMI's products and assets. The parties parted ways, and Mariol acted as his father's agent in handling KMI's products and assets.

In November of 1994 the KMI litigation finally ended in a settlement. Paragraph two of the settlement agreement provided that "JAMES MARIOL hereby assigns to KOHUS all rights, title and interest, whether known or unknown, that he may now have or hereafter acquire in those . . . products identified in Exhibit B . . ., including without limitation any . . design drawings[.]" Exhibit B included product 11-KMI86. Consequently, after November of 1994 Mariol no longer had the right to develop or market the 11-KMI86 latch.

In February of 1995 Mariol, who was consulting with Evenflo Juvenile Furniture Co. ("Evenflo") on a project to develop a collapsible playyard, faxed Evenflo a latch drawing entitled "Joint Version No. 2." Kohus alleges that this drawing is substantially similar to the 11-KMI86 latch.

In January of 1996 Mariol became a contractor for Kolcraft Enterprises, Inc., where he was assigned to assist another engineer in developing a collapsible playyard. Mariol and his co-engineer subsequently obtained two patents from the United States Patent and Trademark Office ("PTO") on playyards they developed at Kolcraft: Patent No. 5,826,285 ("the '285 Patent"), and Patent No. 5,867,851 ("the '851 Patent"). Both of the patent documents present identical drawings of a latch that Kohus alleges was derived from, and substantially similar to, the 11-KMI86 latch. In 1999 Kohus discovered the '285 and '851 Patents while conducting patent searches on the internet, and he then applied for and received a certificate of registration on the 11-KMI86 latch.

Mariol had, in his patent applications, attempted to establish a claim for the allegedly infringing latch, but the patent examiner had not allowed this and had required him to file that claim separately. Mariol subsequently did so, though he amended the patent application with a supplemental information disclosure statement in which he explained to the PTO that Kohus had filed suit against him. In the supplemental disclosure Mariol included the original drawings of the 11-KMI86 latch, though he had not asked Kohus's permission. The PTO nevertheless rejected the latch-related claims in the patent application, finding that they were "anticipated" by the original drawings of the 11-KMI86 latch.

Kohus filed this lawsuit on October 1, 1999, contending *inter alia* that three of Mariol's drawings—Joint Version No. 2, the '285 Patent drawing, and the identical '851 Patent drawing—were substantially similar to the 11-KMI86 latch drawing, and that these three drawings violated his right to create derivatives of the 11-KMI86 latch drawing. The Defendants subsequently filed for summary judgment, arguing that even if the drawings were substantially similar, Kohus's claims should fail because the Defendants did not have access to the 11-KMI86 latch drawing. After the district court found that they did have access and rejected this motion, the Defendants filed another motion for summary judgment, this time arguing that their drawings were not substantially similar to the 11-KMI86 latch drawing. The district court compared the drawings, and refused to consider the conflicting testimony of experts proffered by each side. It concluded that no reasonable trier of fact could find that the Defendants' drawings were substantially similar to the 11-KMI86 latch drawing, and held that since Kohus's substantial similarity argument failed, his derivative copying argument should also fail. Kohus now appeals.

## Analysis

### I. *Whether the Latches Depicted in the Defendants' Drawings Are Substantially Similar to the Latch in Kohus's Copyrighted Drawing*

### A. The Applicable Legal Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In copyright infringement cases "granting summary judgment, particularly in favor of a defendant, is a practice to be used sparingly," but "a court may compare the two works and render a judgment for the defendant on the ground that as a matter of law a trier of fact would not be permitted to find substantial similarity." *Wickham v. Knoxville Int'l Energy Exposition, Inc.*, 739 F.2d 1094, 1097 (6th Cir. 1984) (citations omitted); *see also Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980) ("Because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation[.]") (citing *Arnstein v. Porter*, 154 F.2d 464, 468 & 474 (2d Cir. 1946)).

To succeed in a copyright infringement action, a plaintiff must establish that he or she owns the copyrighted creation, and that the defendant copied it. *Wickham*, 739 F.2d at 1097. In the present case Kohus's ownership of the 11-KMI86 latch drawing is not disputed, and copying is the sole issue.

Not all "copying" is actionable, however: it is a constitutional requirement that a plaintiff bringing an infringement claim must prove "copying of constituent elements of the work *that are original*." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991) (emphasis added); *see also id.* at 348 ("Originality remains the *sine qua non* of copyright; accordingly, copyright protection may extend only to those components of a work that are original

to the author."); *id.* at 345 ("Original . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."). Consequently, before comparing similarities between two works a court should first identify and eliminate those elements that are unoriginal and therefore unprotected. This was the method used by the Court in *Feist*, in which a telephone company sued a publishing company that had reprinted some of its directory listings. The Court noted that where factual compilations such as telephone books are involved, the only original elements are in selection and arrangement, *id.* at 349, and concluded that because the copied listings were taken from "a garden-variety white pages directory, devoid of even the slightest trace of creativity," they were not original and were not entitled to copyright protection. *Id.* at 362–63. In sum, the Court filtered out the unoriginal, unprotected elements, and then determined that there was nothing original to be protected.

In *Feist* it was a given that the defendant had copied the plaintiff's work. For cases like the one before us here, where there is no direct evidence of copying, a plaintiff may establish "an inference of copying by showing (1) access to the allegedly-infringed work by the defendant(s) and (2) a substantial similarity between the two works at issue." *Ellis v. Diffie*, 177 F.3d 503, 506 (6th Cir. 1999). In this case access has been established, and only substantial similarity is at issue.

Courts have established various tests for the substantial similarity finding. The traditional approach is the "ordinary observer" or "audience" test, which "requires the trier of fact to gauge the similarities of the two works solely on the basis of his 'net impression' and without relying on expert analysis or dissection." *Id.* at 506 n.2 (citation omitted); *see also* 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.03[E][1] (1991) (hereinafter "NIMMER"). There are a number of difficulties with this approach, *see* 4 NIMMER § 13.03[E][2], and courts have undertaken various modifications—typically, by adding a prior step that does

allow expert testimony and analytic dissection. *See Arnstein*, 154 F.2d at 468 (distinguishing two essential elements in a substantial similarity suit—"(a) that defendant copied from plaintiff's copyrighted work and (b) that the copying (assuming it to be proved) went so far as to constitute improper appropriation"—and holding that expert testimony is appropriate under the first prong, but not under the second because the determination is to be made from the viewpoint of the ordinary observer); *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1163–64 (9th Cir. 1977) (creating an alternate two-part test: the "extrinsic test," in which expert testimony and analytic dissection may be employed to help the jury "determine whether there has been copying of the expression of an idea rather than just the idea itself"; and the "intrinsic test," in which expert testimony is not appropriate because the trier of fact must determine substantial similarity from the viewpoint of the ordinary reasonable person.)

The Sixth Circuit has thus far "not adopted a specific test for determining substantial similarity in copyright infringement cases," *Ellis*, 177 F.3d at 506 n.2, and this case presents an opportunity to do so. Our criteria in establishing a test are faithfulness to the law—to *Feist*, and to our prior caselaw insofar as it is consistent with *Feist*—and workability.

*Feist*, as we have seen, favors an approach that involves reducing the comparison to elements that are original. The case does not mention the ordinary observer or audience test and it is not necessarily hostile to that test, but—as Nimmer observes—it requires that courts ask this question: "Does the audience test give content to the Court's definition of infringing conduct as 'copying of constituent elements of the work that are original?'" 4 Nimmer § 13.03[E][1][b]. We agree with Nimmer's conclusion: "to the extent that the audience test frustrates that goal, it must be discarded, limited, or tailored to meet the Supreme Court's formulation." *Id*.

Though the Sixth Circuit has not adopted a specific test for substantial similarity, the case *Monogram Models, Inc. v. Industro Motive Corp.*, 492 F.2d 1281 (6th Cir. 1974), obliquely endorsed a two-part test, similar to that in *Arnstein*: the first step allows expert evidence and dissection, and the second requires the trier of fact to evaluate similarity from the viewpoint of the ordinary observer. The case implied the first step when it approved the use of expert testimony in determining similarity—a practice that would be inappropriate if only the traditional ordinary observer test were involved. *See id*. at 1286 ("We find no error in permitting such [expert] testimony."); *see also* 4 Nimmer § 13.03[E][3] (citing, *inter alia*, *Monogram Models*, to substantiate the claim that "[u]nder the *Arnstein* doctrine . . . resort may properly be made to expert analysis[.]"). It endorsed the second step, the ordinary observer test, more overtly: "The question of infringement was dependent upon 'whether the ordinary reasonable person would fail to differentiate between the two works.'" *Monogram Models, Inc.*, 492 F.2d at 1286 (quoting *Williams v. Kaag Mfg. Co.*, 338 F.2d 949 (9th Cir. 1964)).

A two-step approach that reconciles *Feist* and *Monogram Models* is found in *Sturdza v. United Arab Emirates*, 281 F.3d 1287 (D.C. Cir. 2002)[1]: the first step "requires identifying

---

[1]The *Sturdza* case followed the "abstraction-filtration-comparison" approach taken in *Country Kids 'N City Slicks, Inc. v. Sheen*, 77 F.3d 1280 (10th Cir. 1996), which itself adopted for ordinary purposes the specialized computer-software copyright infringement test set forth in *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693 (2d Cir. 1992). *See Country Kids*, 77 F.3d at 1284 n.5. The *Altai* case, in turn, borrowed its formulation of this method from Professor Nimmer. *See Computer Assocs. Int'l.*, 982 F.2d at 707 ("Professor Nimmer suggests, and we endorse, a 'successive filtering method' for separating protectable expression from non-protectable material."); 4 Nimmer § 13.03[F] (describing the test); David Nimmer et al., *A Structured Approach to Analyzing the Substantial Similarity of Computer Software in Copyright Infringement Cases*, 20 Ariz. St. L.J. 625 (1988); *see also* 4 Nimmer § 13.03[E][1][b] (suggesting that courts apply the test in all substantial similarity cases, and not merely in computer software cases).

which aspects of the artist's work, if any, are protectible by copyright," *id.* at 1295; the second "involves determining whether the allegedly infringing work is 'substantially similar' to protectible elements of the artist's work," *id.* at 1296. We approve this method, and adopt it.

The essence of the first step is to filter out the unoriginal, unprotectible elements—elements that were not independently created by the inventor, and that possess no minimal degree of creativity, *see Feist*, 499 U.S. at 345—through a variety of analyses. It is axiomatic, to begin with, that mere abstract ideas are not protectible, but the expression of an idea is. *See Mazer v. Stein*, 347 U.S. 201, 217 (1954) ("Unlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea—not the idea itself."); 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea[.]"). Often helpful in distinguishing between the two is Judge Learned Hand's famous "abstractions test," formulated in a case discussing plays:

> Upon any work, and especially upon a play, a great number of patterns of increasing generality will fit equally well, as more and more of the incident is left out. The last may perhaps be no more than the most general statement of what the play is about, and at times might consist only of its title; but there is a point in this series of abstractions where they are no longer protected, since otherwise the playwright could prevent the use of his "ideas," to which, apart from their expression, his property is never extended.

*Nichols v. Universal Pictures Corp.*, 45 F.2d 119, 121 (2d Cir. 1930). This test of course does not identify the dividing line in individual cases, but rather constitutes a methodological tool courts can use to identify the spectrum of options. In the present case we do not presume to establish a scheme of abstractions, and we leave that issue for the parties to develop before the district court. Nevertheless, by way of

example, an initial description of the 11-KMI86 latch would likely be quite detailed—a steel-enclosed hinge employing two banana-shaped flippers that cross over one another and share a common pivot point like scissors, each flipper fitting into a notch on the rail, and so on. In successive abstractions details like the shape of the steel enclosure would fall away, leaving the essentials, particularly the double-hinged feature, intact.

Next, in cases like this one, that involve a functional object rather than a creative work, it is necessary to eliminate those elements dictated by efficiency. *See Baker v. Selden*, 101 U.S. 99, 103 (1879) ("[W]here the art [that a science book] teaches cannot be used without employing the methods and diagrams used to illustrate the book, or such as are similar to them, such methods and diagrams are to be considered as *necessary incidents* to the art[.]") (emphasis added). To this end, the merger doctrine establishes that "[w]hen there is essentially only one way to express an idea, the idea and its expression are inseparable [i.e., they merge,] and copyright is no bar to copying that expression." *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988). In the present case expert testimony will likely be required to establish what elements, if any, are necessary to the function of any latch designed for the upper arm of a collapsible playyard.

It is also important to filter out *scenes a faire*: "those elements that follow naturally from the work's theme, rather than from the author's creativity," 4 NIMMER § 13.03[F][3], or elements that are "dictated by external factors such as particular business practices," *Computer Mgmt. Assistance Co. v. Robert F. DeCastro, Inc.*, 220 F.3d 396, 401 (5th Cir. 2000). In the present case, possible external considerations could include standard industry practices for constructing latches, or safety standards established by organizations like the American Society for Testing Materials and the Juvenile Products Manufacturer's Association.

Once the unprotectible elements have been filtered out, the second step is to determine whether the allegedly infringing work is substantially similar to the protectible elements of the original. We noted above that our *Monogram Models* case establishes that this determination should be based on the judgment of the ordinary reasonable person (i.e., the ordinary lay observer). *See* 492 F.2d at 1286. This standard, however, is in need of modification.

The ordinary observer test is based on the economic incentive view of copyright law, that the "purpose of the copyright laws [is to] provid[e] creators with a financial incentive to create for the ultimate benefit of the public." *Dawson v. Hinshaw Music, Inc.*, 905 F.2d 731, 733 (4th Cir. 1990); *see also Mazer*, 347 U.S. at 219 ("The economic philosophy behind the clause empowering Congress to grant patents and copyrights is the conviction that encouragement of individual effort by personal gain is the best way to advance public welfare through the talents of authors and inventors in 'Science and useful Arts.'"). The test was designed for cases where the lay audience purchases the product at issue, and where the lay audience's untutored judgment determines whether the product will sell. *See Arnstein*, 154 F.2d at 473 ("The question, therefore, is whether defendant took from plaintiff's works so much of what is pleasing to the ears of lay listeners, who comprise the audience for whom such popular music is composed, that defendant wrongfully appropriated something which belongs to the plaintiff."); *Dawson*, 905 F.2d at 734 (noting that in *Arnstein* "[t]he lay listener's reaction is relevant because it gauges the effect of the defendant's work on the plaintiff's market.").

In cases where the target audience possesses specialized expertise, however, the specialist's perception of similarity may be much different from the lay observer's, and it is appropriate in such cases to consider similarity from the specialist's perspective. The larger principle here is that the inquiry in the second prong of the substantial similarity test should focus on the *intended audience*. This will ordinarily be the lay public, in which case the finder of fact's judgment should be from the perspective of the lay observer or, as *Monogram Models* put it, the ordinary reasonable person. But in cases where the audience for the work possesses specialized expertise that is relevant to the purchasing decision and lacking in the lay observer, the trier of fact should make the substantial similarity determination from the perspective of the intended audience. Expert testimony will usually be necessary to educate the trier of fact in those elements for which the specialist will look. *See Dawson*, 905 F.2d at 736 ("Such an inquiry [into the viewpoint of an observer with specialized expertise] may include, and no doubt in many cases will require, admission of testimony from members of the intended audience or, possibly, from those who possess expertise with reference to the tastes and perceptions of the intended audience."); *see also Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 713 (2d Cir. 1992) ("In making its finding on substantial similarity with respect to computer programs, we believe that the trier of fact need not be limited by the strictures of its own lay perspective. Rather, we leave it to the discretion of the district court to decide to what extent, if any, expert opinion, regarding the highly technical nature of computer programs, is warranted in a given case.") (citations omitted).

We also share *Dawson*'s concern that our holding should not be "read as an invitation to every litigant in every copyright case to put before the court the seemingly unanswerable question of whether a product's audience is sufficiently specialized to justify departure from the lay characterization of the ordinary observer test." 905 F.2d at 736. Consequently, we agree that

in any given case, a court should be hesitant to find that the lay public does not fairly represent a work's intended audience. In our opinion, departure from the lay characterization is warranted only where the intended audience possesses "specialized expertise." We thereby pay heed to the need for hesitancy when departing from the indiscriminately selected lay public in applying the

test. To warrant departure from the lay characterization of the ordinary observer test, "specialized expertise" must go beyond mere differences in taste and instead must rise to the level of the possession of knowledge that the lay public lacks.

*Id*. at 737.

## B. The Legal Standard Applied

The district court in the present case applied the ordinary observer test, only, and on the basis of that test it rejected expert testimony proffered by both Kohus and the Defendants. Instead it analyzed the drawings of the latches on its own, concluding that no reasonable finder of fact could determine that they were substantially similar.

In light of our restated and modified substantial similarity determination procedure, however, it is evident that the district court must conduct its proceedings anew. The first prong of the inquiry will almost certainly require expert testimony, because the drawings are technical in nature and a lay person is unlikely to understand what constitutes creativity in this area, which elements are standard for the industry, and which elements are dictated by efficiency or by external standards. In conducting the second prong, the district court should consider substantial similarity from the viewpoint of the intended audience, the nature of which the court must determine. This appears to be one of those rare cases where the intended audience is not the lay public: the drawings are technical and are appropriate for patent treatment; interpretational guidance is needed for the lay viewer to imagine the structure and function of the device that the drawings depict; and the initial purchasers of the device would probably be trained engineers, capable of discerning technical niceties that the ordinary person would not detect, and likely to base their purchasing decision on such details.

## II. *Whether the Defendants Violated Kohus's Right to Create Derivatives*

Kohus, as the copyright holder of the 11-KMI86 latch drawing, has the right to create derivative works from that drawing. *See* 17 U.S.C. § 106(2) ("[T]he owner of a copyright under this title has the exclusive rights . . . to prepare derivative works based upon the copyrighted work[.]"). He claims that the Defendants' drawings constitute derivative works that violate his rights. The district court, on the basis of its determination that no reasonable person could conclude that the Defendants' drawings were substantially similar to the 11-KMI86 latch drawing, found that the Defendants' drawings were not sufficiently similar to constitute a violation of Kohus's right to produce derivatives.

The district court was correct in determining that Kohus cannot succeed on his derivative claim if the Defendants' drawings are not substantially similar to his. *See* 1 NIMMER § 3.01 ("[A] work will be considered a derivative work only if it would be considered an infringing work if the material that it has derived from a pre-existing work had been taken without the consent of a copyright proprietor of such pre-existing work."); *Litchfield v. Spielberg*, 736 F.2d 1352, 1357 (9th Cir. 1984) ("The little available authority suggests that a work is not derivative unless it has been substantially copied from the prior work."). Nevertheless, since the court's substantial similarity determination is invalid, we must also vacate and remand its disposition of Kohus's derivative claim.

## III. *Whether Mariol Violated the Disclosure Requirements of 37 C.F.R. § 1.71*

Kohus additionally argued to the district court that Mariol violated the requirements of 37 C.F.R. § 1.71 by including the 11-KMI86 latch drawing in the supplemental disclosure to the patent application he filed for his allegedly-infringing latch, because he did so without asking permission and without disclosing that the drawing was copyrighted. The district court did not address this claim, and Kohus now argues that

the district court "ignored this probative and uncontroverted evidence and thus committed reversible error." Appellant's Brief at 42.

To consider the relevant law: 37 C.F.R. § 1.71(d) provides that:

> [a] copyright . . . notice may be placed in a design or utility patent application adjacent to copyright . . . material contained therein . . . Inclusion of a copyright . . . notice will be permitted only if the authorization language set forth in paragraph (e) of this section is included at the beginning . . . of the specification.

Paragraph (e) then provides the required disclosure: "A portion of the disclosure of this patent document contains material which is subject to [copyright] protection. The [copyright] owner has no objection to the facsimile reproduction . . . but otherwise reserves all [copyright] rights whatsoever." 37 C.F.R. § 1.71(e); *see also id.* § 1.84(s) ("A copyright . . . notice may appear in the drawing, but must be placed within the sight of the drawing immediately below the figure representing the copyright . . . material[.]").

We note, first, that the language of 37 C.F.R. § 1.71(d) is permissive—a copyright notice *may* be placed in a patent application—and consequently an applicant's failure to include such a notice in his or her application would not appear to be a violation at all. Even if it were, this fact would have no discernible bearing on Kohus's substantial similarity or derivative claims, and assuming Kohus can bring suit for a violation, the C.F.R. provides no statutory damages and Kohus alleges no actual damages. We conclude that this claim is meritless.

### Conclusion

We vacate the judgment of the district court, and remand for further proceedings in accordance with this opinion.