Marc KELLMAN and David
Kellman, Plaintiffs,

v.

The COCA–COLA COMPANY, Coca–
Cola Enterprises, Inc. Detroit Red
Wings, Inc. and NHL Enterprises,
L.P., Defendants.

No. 03–71542.

United States District Court,
E.D. Michigan,
Southern Division.

Aug. 12, 2003.

Andrew M. Zack, Andrew J. Munro, Michael D. Kennedy, Munro & Zack, Troy, MI, for Plaintiffs.

David N. Zacks, Jacqueline H. Sellers, Lewis & Munday, Detroit, MI, Michael J. Kline, Coca–Cola Company, Bruce W. Baber, Charmaine D. Williams, King & Spalding, Atlanta, GA, Gerald E. McGlynn, III, Bliss, McGlynn, Troy, MI, for Defendants.

### OPINION AND ORDER

O'MEARA, District Judge.

Before the Court are Defendants' motions to dismiss. This is a patent and copyright infringement case. Plaintiffs Marc and David Kellman allege that the Detroit Red Wings and the Coca–Cola Corporation used an image of their copyrighted and patented "Wing Nut Hat" on t-shirts and bottlecaps. We had a hearing on August 8, 2003. Having reviewed and considered the parties' motions, briefs and supporting documents, and having further considered the oral arguments of counsel, the Court is now prepared to rule on this matter. For the following reasons, we deny Defendants' motions to dismiss with respect to the copyright claims but grant their motions to dismiss with respect to the design patent claims.

### BACKGROUND FACTS

Plaintiffs Marc Kellman and David Kellman invented a novelty foam hat in the

shape of a wing nut sometime prior to October 9, 1996. According to the Kellmans, they are devoted fans of the Detroit Red Wings organization and created the hat so that they and other fans could demonstrate that they were "nuts" about the "wings." The Kellmans contend that their invention was not only the foam novelty hat, but also the visual pun that this hat represents.

The Kellmans applied for a patent for this invention on October 9, 1996. On November 14, 1996, the Kellmans registered with the United States Copyright Office a work entitled "Wing Nut Sculpture" bearing Registration No. VA 827–878. (Plaintiffs' Exhibit 2). On December 16, 1997, the Kellmans received a patent from the United States Commissioner of Patents and Trademarks for a novelty hat in the shape of a wing nut bearing Patent No. Des. 387,541. (Plaintiffs' Exhibit 3). Specifically, the patent issued is for "the ornamental design for a hat as shown and described." *Id.* In order to register the word phrases and marks "Wing Nut" and "Wing–Nut," the Kellmans applied for a trademark with the United States Commissioner of Patents and Trademarks bearing Serial Nos. 75/178,835 and 75/361,-267.

As explained by the Kellmans, the Detroit Red Wings objected to their attempts to manufacture and market the novelty hats and other items using the Wing Nut trademark. According to Plaintiffs, the Red Wings would not allow them to sell the novelty hat at Joe Louis Arena or in company stores. The Red Wings also filed opposition proceedings in the United States Patent and Trademark Office, objecting to the Kellmans' request for the Wing Nut Trademark.

The Kellmans assert that, while opposing their attempts to market the novelty hat, the Red Wings also sought to exploit Plaintiffs' copyright and patent for its own commercial benefit. The Red Wings allowed IBM Corporation and the advertising firm Ogilvy & Mather to publish a print advertisement in various newspapers featuring a person wearing Plaintiffs' novelty hat. This alleged infringement on the Kellmans' Wing Nut Copyright and Patent led to the execution on May 9, 2000 of a Settlement Agreement between the Kellmans, the Red Wings and others. (Plaintiffs' Exhibit 4).

Drafted by an attorney representing both the Red Wings and NHL Enterprises, Ltd., the 2000 Settlement Agreement provided that the Red Wings agreed to withdraw and dismiss its opposition proceedings in the United States Patent and Trademark Office regarding the Wing Nut Trademark. The Kellmans, in turn, agreed to assign the Wing Nut Trademark to the Red Wings, thereby entitling the latter to use the word phrases and marks "Wing Nut" and "Wing–Nut." [1] In addition, the Settlement Agreement gave the Red Wings the right to sell the novelty hat and related merchandise bearing the "Wing Nut" trademark while giving the Kellmans a percentage of any sales. Significantly, the Settlement Agreement also recognized the validity of the Kellmans' Wing Nut Copyright and Patent, stating that "[a]s between the parties, the Kellmans shall retain any copyright and patent rights in the underlying design of the Novelty Hats" and that they "shall be solely

---

**1.** There is no trademark claim in this case because of the assignment of the trademark to the Red Wings. The Plaintiffs maintain that the trademark was only for the terms "Wing Nut" and "Wing–Nut." Neither party included a copy of the original trademark registration in their briefs. There is a copy of the assignment of the trademark in Plaintiffs' original complaint, Exhibit D.

responsible for reaching an independent agreement with Manufacturer, pursuant to which the Kellmans shall license for a fee to Manufacturer the copyright and patent rights to manufacture the Novelty Hats." (Plaintiffs' Exhibit 4).

In this current litigation, Plaintiffs allege that not only did the Red Wings fail to make reasonable, good faith efforts to sell the novelty hats and related merchandise,[2] but that the Red Wings also infringed on the Kellmans' "Wing Nut" Copyright and Patent. The Red Wings marketed and sold for commercial purposes at Joe Louis Arena and the Red Wings' Hockeytown retail stores two versions of a t-shirt bearing a design that Plaintiffs allege is an exact reproduction of, and/or substantially similar to, the designs depicted in the Kellmans' Wing Nut Copyright and Patent. In other words, the t-shirts display a picture of what appears to be the Kellmans' novelty hat. (*See* Plaintiff's Exhibit 5). Plaintiffs allege that the Red Wings made the reproduction of Plaintiffs' copyrighted and patented designs without their consent or permission.

Another type of alleged infringement surfaced in late 2002 and early 2003, when the Coca–Cola Company and/or Coca–Cola Enterprises, Inc. (collectively "the Coca–Cola Defendants"), marketed and sold Coca–Cola soda pop, upon which the words, "Be a Wing–Nut!," appeared on the label of its products and the term, "Wing–Nuts," appeared on the cap of the products ("Coca–Cola's Wing–Nuts Campaign"). (Plaintiffs' Exhibit 6). Plaintiffs maintain that a substantially similar reproduction of the designs depicted in their Wing Nut Copyright and Patent also appeared on the

bottle cap of the soda bottles sold in Coca–Cola's Wing–Nuts Campaign. Again, in other words, the bottlecaps contain an image of what appears to be a picture of the Kellmans' novelty hat. The Kellmans allege that the Coca–Cola Defendants took these actions without their consent or permission. Plaintiffs also assert that the Coca–Cola Defendants' reproduction on their bottle caps of the designs depicted in the Kellmans' "Wing Nut" Copyright and Patent was done with the knowledge, consent and contribution of the Red Wings.

The Coca–Cola Defendants filed motions to dismiss Counts I and III of the First Amended Complaint. Count I alleges direct copyright infringement by the Coca–Cola Defendants. Count III alleges direct patent infringement by the Coca–Cola Defendants. The Detroit Red Wings filed motions to dismiss the remaining counts of the First Amended Complaint. Count II alleges contributory copyright infringement by the Detroit Red Wings. Count IV alleges inducement of patent infringement by the Detroit Red Wings. Count V alleges contributory patent infringement by the Detroit Red Wings. In other words, although Counts II, IV and V are against the Detroit Red Wings, they are derived from the alleged violations of the Coca–Cola Defendants and deal with the use of the image on the Coca–Cola bottlecaps. (Hence, if we dismissed Counts I and III against the Coca–Cola Defendants, Counts II, IV and V against the Detroit Red Wings for their alleged role in these violations would also be dismissed.) Finally, Count VI alleges direct copyright infringement by the Detroit Red Wings

---

**2.** We declined to extend supplemental jurisdiction over Plaintiffs' state claims. Count VIII of the First Amended Complaint alleged a breach of the settlement agreement by the Detroit Red Wings. Count IX alleged a breach of the settlement agreement by the

Detroit Red Wings and NHL Enterprises. Count X alleged fraudulent inducement by the Detroit Red Wings. These state claims were dismissed on May 15, 2003. At issue now are only the copyright and patent claims.

while Count VII alleges direct patent infringement by the Detroit Red Wings. Counts VI and VII deal with the use of the image on the t-shirts sold by the Detroit Red Wings. For the following reasons, we dismiss Counts III, IV, V, and VII which deal with the patent claims. Counts I, II and VI which deal with the copyright claims remain.

## STANDARD OF REVIEW

In considering a motion brought pursuant to Fed R. Civ. P. 12(b)(6), the court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.1993). Moreover, the test for dismissal under Fed.R.Civ.P. 12(b)(6) is a stringent one. As the United States Supreme Court held in *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993), "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claims which would entitle him to relief."

## LAW AND ANALYSIS

### I. Settlement Agreement

■ The Red Wings[3] first argue that we should dismiss this case because of the prior Settlement Agreement. The Red Wings assert that they had a license to sell "wing nut merchandise" under the Kellmans' copyright and design patents. Plaintiffs counter that such a position misrepresents the 2000 Settlement Agreement between the parties. At issue, is the interpretation of Paragraph 3 of the Settlement Agreement. The Kellmans argue that the Settlement Agreement granted a license to the Red Wings only with respect to the "Wing Nut" *trademark*. In other words, according to the Kellmans, while the Red Wings could use the trademark "Wing Nut" or "Wing–Nut" on the t-shirts and bottlecaps (i.e. merchandise), they could not take a picture of Plaintiffs' patented and copyrighted novelty hat and place it on the merchandise.

■ Assuming the Settlement Agreement is ambiguous on this point, at this stage in the litigation especially, we should defer to Plaintiffs' interpretation. (As a substantive matter, we also believe Plaintiffs' interpretation is more correct.) Furthermore, as Plaintiffs point out, assuming there is any ambiguity, because the Red Wings drafted the Settlement Agreement, which provides that New York law governs, any ambiguity in its construction must be construed against the Red Wings. *See Eveready Ins. Co. v. Farrell*, 304 A.D.2d 830, 757 N.Y.S.2d 859, 860 (2003).

Paragraph 3, which is labeled "Payment," concerns the payment to the Kellmans for entering into the Settlement Agreement and assigning the "Marks," which are defined on page 2 of the Settlement Agreement as the written words "Wing Nut" and "Wing–Nut." Paragraph 3(a) requires the payment of $15,000.00 to the Kellmans upon execution of the Settlement Agreement. Paragraph 3(b) provides for additional payments to Plaintiffs, calculated as a percentage of the retail or wholesale sales prices of licensed "Team Products," which are defined as "Wing Nut Merchandise" that is manufactured or licensed by the Red Wings. "Wing Nut Merchandise," in turn, is defined as "mer-

---

**3.** Only the Red Wings make this argument concerning the Settlement Agreement as the Coca–Cola Defendants were not privy to this agreement.

chandise, other than the Novelty Hats,"[4] which is produced or licensed by the Red Wings and which "bear[...] the Marks." Thus, as argued by Plaintiffs, "Wing Nut Merchandise," which consists of products that bear either the word "Wing Nut" or "Wing–Nut," is completely distinct from the articles depicted in the Wing Nut Copyright and Patent. As Plaintiffs point out, by definition, "Wing Nut Merchandise" is any other product besides the articles depicted in the Wing Nut Copyright and Patent. Although we certainly do not need to make a definitive ruling at this point in the litigation, we tend to agree with Plaintiffs' interpretation. For example, if the Red Wings were to design a t-shirt with the trademarked phrase "Wing Nut" without a visual representation of the image copyrighted and patented by Plaintiffs, then we believe that the Red Wings would be within its rights as set forth in the Settlement Agreement. While the Red Wings vehemently argue that it had a license to use the mark "wing-nut" on merchandise, we do not believe they may use the mark "wing-nut" while violating Plaintiffs' Patent and Copyright. (Although as we explain *infra,* as a substantive matter, we do not believe the patent has been infringed.)

The language of Paragraph 3(b) on which the Red Wings base their argument states: "For the first three complete hockey seasons that commence on or after the Effective Date [May 9, 2000], the Team [the Red Wings] will make a good faith effort to produce and license the right to sell merchandise, other than the Novelty Hats, bearing the Marks ('Wing Nut Merchandise') in the Arena and in Team-owned stores within seventy-five (75) miles of the Arena." As emphasized by the Kellmans, nothing in this language constitutes or even refers to a grant by the Kellmans to the Red Wings of a license of Plaintiffs' rights under their Copyright or Patent. Rather, as we interpret the agreement, the only licensing right that the Kellmans conferred upon the Red Wings related to the production of and the licensing of others to sell products bearing either the word "Wing Nut" or "Wing–Nut"—not the use of the visual image of their novelty hat on other merchandise.

Furthermore, as emphasized by Plaintiffs, the Settlement Agreement's treatment of the Kellmans' Copyright and Patent indicates that the breadth of Red Wings' license argument has no merit. Page 2 of the Settlement Agreement contains acknowledgments that the Kellmans "own a copyright registration for a 'wing nut sculpture'" and that they "own a patent for a wing nut hat design." These copyright and patent rights are separate and distinct from "the Marks." Paragraph 1 of the Settlement Agreement, which is entitled "Assignment of Marks," contains an assignment by the Kellmans to the Red Wings of "all their right and title in and to the Marks, and any other rights they claim in the words 'wing nut' including any good will associated with the Marks, and any trademark/service mark applications or registrations for the Marks ...." Significantly, there is no comparable provision in the Settlement Agreement assigning to the Red Wings any of Plaintiffs' rights to their Copyright or Patent. Indeed, Paragraph 2(c) states that the Kellmans "shall be solely responsible for reaching an independent agreement with Manufacturer, pursuant to which the Kellmans shall license for

---

4. The Novelty Hats, which are defined on page 1 of the Settlement Agreement as "novelty foam hats using, *inter alia,* the colors red and white, in the shape of a wing nut," are the same articles whose designs are depicted in the Kellmans' Wing Nut Copyright and Wing Nut Patent.

a fee to Manufacturer the copyright and patent rights to manufacture the Novelty Hats." Importantly, this language does not mention assignment or licensing with regard to Plaintiffs' Copyright or Patent, and thus belies the Red Wings' position.

In sum, we reject the Red Wings' argument that this case should be dismissed based on the Settlement Agreement alone. We believe that the Settlement Agreement establishes that, while the Red Wings have a license to use the phrase "wing nut," it does not have a license to use Plaintiffs' Copyright and Patent. And if the Settlement Agreement is ambiguous on this point, we should credit Plaintiffs' interpretation, especially at this stage of the litigation. Therefore, we must turn to the substantive arguments concerning copyrights and design patents.

## II. Copyright Infringement Claims

To establish a claim of copyright infringement, the claimant must prove (1) ownership of a valid copyright, and (2) "copying of constituent elements of the work that are original." *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 361, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). Defendants do not dispute Plaintiffs' ownership of a valid copyright in the "Wing Nut Sculpture," but rather focus on the second element of the test.

The Sixth Circuit in *Kohus v. Mariol,* 328 F.3d 848 (6th Cir.2003) recently articulated a two-part test for determining the second "copying" element of the test for copyright infringement. "The first step 'requires identifying which aspects of the artist's work, if any, are protectable by copyright'; the second 'involves determining whether the allegedly infringing work is substantially similar to protectable elements of the artist's work.'" *Id.* at 855 (citations omitted).

### A. The Filtering Of The Unprotected Elements Test

The first step in the *Kohus* inquiry involves filtering out the unoriginal, and therefore unprotected, elements of the Wing Nut Sculpture. *Id.* at 853. This is consistent with the United States Supreme Court's holding in *Feist Publications, Inc. v. Rural Tel. Serv. Co.,* 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991), that the *"sine qua non* of copyright is originality." The originality requirement is usually not a difficult hurdle for copyright infringement plaintiffs to surmount. As the *Feist* Court held, "[o]riginal, as the term is used in copyright, means only that the work was independently created by the author ... and that it possesses at least some minimal degree of creativity." *Id.*

Defendants want this Court to view the Wing Nut Sculpture as a merely a three dimensional foam depiction of a hardware screw device—in essence, something not original. Plaintiffs counter, however, that the Wing Nut Sculpture acts as a visual pun on the name of the hardware device. As explained by Plaintiffs, the "Wing" refers to the Detroit Red Wings. The "Nut" refers to a person who is fanatical in his or her devotion to something. Hence, as emphasized by Plaintiffs, "Wing Nuts" are literally fanatic supporters of the Detroit Red Wings and the "Wing Nut Sculpture" was designed as a novelty foam sculpture hat that expresses that idea in a very clever and original fashion. At this stage of the litigation, we agree with Plaintiffs. The Defendants' argument that the Wing Nut Sculpture is merely a 3D depiction of a common hardware device is too narrow. When the *Kohus* filtering step is applied, the original elements that remain are the artistic expression of the idea of fanatical support for the Detroit Red Wings in the form of a novelty foam hat shaped like a

wing nut, as well as the size, shape and proportions of the Wing Nut Sculpture.

## B. The Substantial Similarity Test

■ With regard to the second part of the *Kohus* test, the substantial similarity inquiry, the Sixth Circuit reiterated that "because substantial similarity is customarily an extremely close question of fact, summary judgment has traditionally been frowned upon in copyright litigation." 328 F.3d at 853; *citing Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 977 (2nd Cir.1980). The *Kohus* court also held that the inquiry in the substantial similarity test "should focus on the *intended audience.* This will ordinarily be the lay public, in which case the finder of fact's judgment should be from the perspective of the lay observer or, as *Monogram Models* put it, the ordinary reasonable person." 328 F.3d at 857; (emphasis in original). Defendants do not contest that the perspective of the ordinary reasonable lay person should be used in making the required substantial similarity inquiry. Because Plaintiffs' claims against the Red Wings and the Coca–Cola Defendants involve different infringing articles, they will be analyzed separately under the substantial similarity test.

### 1. Red Wings T–Shirts

■ The Red Wings would like this Court to find no substantial similarity between the Wing Nut Sculpture and its t-shirts based on very minor variations in the angles of the extensions of the wings,

the tops of the wings, and widths of the bases. The Red Wings even suggest that the fact that the hat on the cartoon bear's head is tilted represents some sort of substantial disparity. However, by performing a side-by-side examination of the Wing Nut Sculpture and the Red Wings' t-shirts, we believe that a reasonable lay person would determine that what is being depicted on the t-shirts is a two-dimensional image of a wing nut hat that is substantially similar (if not identical) to Plaintiffs' Wing Nut Copyright.[5]

■ The Red Wings' final argument is that their designs have a different total concept and feel from the Wing Nut Sculpture. This argument is based on the notion that the Wing Nut Sculpture is a three-dimensional sculpture that functions as a hat and the t-shirts contain two-dimensional drawings that are merely decorative. Yet, as pointed out by Plaintiffs, this argument is flawed because it would mean that a two-dimensional reproduction of a three-dimensional sculpture cannot infringe upon a copyright—a proposition that is contrary to prior case law. *See, e.g., Ty Inc. v. Publications Intern. Ltd.,* 292 F.3d 512, 519 (7th Cir.2002)("But remember that photographs of Beanie Babies are conceded to be derivative works, for which there may be a separate demand that Ty may one day seek to exploit, and so someone who without a license from Ty sold photographs of Beanie Babies would be an infringer of Ty's sculpture copyrights."); *Rogers v. Koons,* 751 F.Supp.

---

**5.** Indeed, Plaintiffs point out that given the Red Wings' familiarity with the Wing Nut Sculpture by virtue of their past dealings with Plaintiffs, a reasonable inference could be made that the Red Wings copied the Kellmans' novelty hat onto the t-shirts in order to capitalize on its popularity in the marketplace. Certainly, at a minimum, we agree that Plaintiffs should be allowed to take discovery from the Red Wings and anyone who designed and manufactured the t-shirts in order to see if the Red Wings intended to copy a two-dimensional image of the Wing Nut Copyright onto the t-shirts and to determine the source of the idea for placing an image of a wing nut hat on those products. Dismissal of Plaintiffs' claim against the Red Wings would be at the very least premature without allowing the Kellmans to take the discovery sought.

474 (S.D.N.Y.1990) (holding that a reproduction of a copyrighted photograph in sculpture form did not preclude finding of copyright infringement). While a t-shirt and a novelty hat are, on their face, distinct items, there is a substantial similarity between the image displayed on the t-shirt and the Kellmans' copyrighted sculpture. The image used by the Red Wings on its t-shirts not only looks substantially similar to the Kellmans' copyrighted sculpture, but the message the t-shirt attempts to convey is also substantially similar, if not exact, to the message conveyed by the novelty hat. We believe that dismissal at this stage—without any discovery—would be error.

### 2. Coca–Cola Bottlecaps

■ A side-by-side comparison of the Wing Nut Sculpture and the Coca–Cola Defendants' bottlecaps shows that the differences cited by Defendants with respect to the shapes of the bases, hollow centers, and wings are very minor. Indeed, as Plaintiffs attest (and as Plaintiffs' counsel emphasized at the hearing), a reasonable lay person could find remarkable similarities between the two works and could conclude that the Coca–Cola Defendants reproduced a two-dimensional image of the novelty hat depicted in the Wing Nut Copyright as closely as possible on the limited space available on a bottlecap. As stressed by Plaintiffs, the Coca–Cola Defendants have prevented Plaintiffs from taking discovery from them, their local bottling company, their advertising firm, and the designer of the bottlecap regarding the source of the idea for placing the image in question on the bottlecaps. Therefore, many questions regarding the Coca–Cola Defendants' decision to use the

image are unanswered at this point in the litigation. As is the case with regard to the Red Wings, we believe that dismissal of Plaintiffs' claims against the Coca–Cola Defendants would at the very least be premature without allowing the Kellmans the opportunity to take discovery.[6]

### III. Design Patent Infringement Claims

■ In Counts III (against the Coca–Cola Defendants) and VII (against the Red Wings), the Kellmans claim that Defendants infringed their Wing Nut Patent. A design patent protects the nonfunctional aspects of an ornamental design as shown in the patent. *Elmer v. ICC Fabricating Inc.,* 67 F.3d 1571, 1577 (Fed. Cir.1995). It is well established that "[d]etermining whether a design patent is infringed requires (1) construction of the patent claim, and (2) comparison of the construed claim to the accused product." *Contessa Food Products, Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002). In the first step of this analysis, the court construes the patent as a matter of law, *Catalina Lighting, Inc. v. Lamps Plus, Inc.,* 295 F.3d 1277, 1285 (Fed.Cir.2002), based upon the principle that "[i]n construing a design patent claim, the scope of the claimed design encompasses 'its visual appearance as a whole,' and in particular 'the visual impression it creates.'" *Contessa Food Products,* 282 F.3d at 1376; *citing Durling v. Spectrum Furniture Co.,* 101 F.3d 100, 104–105 (Fed.Cir.1996). The comparison test is conducted as a question of fact, *Catalina Lighting, supra,* 295 F.3d at 1285, and requires that a plaintiff satisfy two distinct tests known as the "ordinary observer" test and the "point of novelty"

---

**6.** Defendants cite a myriad of copyright cases that they attest support their position. We believe that Plaintiffs' counsel does a good job of distinguishing these cases in his brief and do not discuss all the cases in this Opinion and Order.

test. *Contessa Food Products,* 282 F.3d at 1377.

## A. Wing Nut Patent

Plaintiffs described their "Claim" in the Wing Nut Patent as "[t]he ornamental design for a hat, as shown and described" in five accompanying two-dimensional drawings of different perspectives of a hat shaped like a wing nut. (Plaintiffs' Exhibit 3). While Defendants vehemently maintain that the design patent is for a hat, Plaintiffs maintain that the Wing Nut Patent does not limit the design of the hat as consisting solely of a three-dimensional article. The fundamental disagreement concerning the patent issue is whether the design patent in this case is solely for a hat shaped like a wing nut or for the visual pun or expressive qualities that the hat creates. Yet, we believe that the Kellmans' argument about the hat's expressive qualities fits better with the purpose of copyright laws which protect expression and not patents which protect tangible items. As explained *supra,* in order to establish infringement of a design patent, a plaintiff must satisfy two distinct tests known as the "ordinary observer" test and the "point of novelty" test. Because Plaintiffs cannot establish the former test, we do not address the latter.

## B. Ordinary Observer Test

▆ In the seminal case of *Gorham Co. v. White,* 81 U.S. 511, 528, 20 L.Ed. 731 (1871), the United States Supreme Court formulated the "ordinary observer" test as follows:

> We hold, therefore, that if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other, the

first one patented is infringed by the other.

Thus, as is the case with the copyright infringement "substantial similarity" test, the relevant perspective is that of an ordinary reasonable lay observer, *i.e.,* "observers of ordinary acuteness, bringing to the examination of the article upon which the design has been placed that degree of observation which men of ordinary intelligence give." *Id.*

▆ Defendants contend that the Kellmans' claim fails the "ordinary observer" test because individuals could not possibly be deceived into purchasing the Red Wings' t-shirts or the Coca–Cola Defendants' bottlecaps (in connection with a soda or "pop" bottle) thinking they were buying a hat, given that the Kellmans patented a design of a three-dimensional hat and Defendants' products are completely different articles of manufacture depicting two-dimensional images. Plaintiffs counter by citing a forty year old case from the former United States Court of Customs and Patent Appeals ("CCPA") which contains some favorable language for Plaintiffs' position. In *In re Rubinfield,* 47 C.C.P.A. 701, 270 F.2d 391, 393 (1959), the CCPA held that "[i]t is well settled that a design patent may be infringed by articles which are specifically different from that shown in the patent. It seems evident, therefore, that the inventive concept of a design is not limited to the exact article which happens to be selected for illustration in an application or patent." Yet, *In re Rubinfield* was not in the context of a patent infringement case and the favorable language quoted above has not been relied on in any subsequent cases (at least we could not find any and the Kellmans have not found any.) The fundamental question we have to decide—and there is not much case law to guide us—is whether a design patent can be infringed when the articles

of manufacture are so entirely different (i.e. a novelty hat versus a t-shirt or bottle-cap) that no reasonable person would purchase the t-shirt or bottlecap thinking that he or she was purchasing the novelty hat. After analysis, we do not find that the design of the hat as compared to the t-shirts and bottlecaps to be substantially similar to cause confusion. Plaintiffs attest that the design patent protects the visual pun that the novelty hat represents. Yet, Plaintiffs cite no case law which holds that an intangible, visual pun can be protected by a design patent which is supposed to protect the non-functional, ornamental features of a tangible item. Again, we think Plaintiffs' visual pun argument fits more in line with copyright protection—not patents.

The case most on point, cited by Defendants, is *Vigil v. Walt Disney Co.,* 1998 U.S. Dist. LEXIS 22853 (N.D.Cal. December 1, 1998), where the court found that a patented design for a hockey stick duck call was not substantially similar to defendant's hockey stick key chain because—despite some similarity in appearance (they both were in the shape of a hockey stick)—the two items were designed to perform entirely different functions. Plaintiffs' attempt to distinguish this case by arguing that, in the case *sub judice,* the purposes/functions behind the novelty hat and the t-shirts and bottlecaps are the same (i.e. devotion to Red Winds) is unavailing. In sum, because Plaintiffs' design patent claims fail the "ordinary observer" test, we dismiss the design patent claims.

### ORDER

It is hereby **ORDERED** that Defendants' motions to dismiss are **GRANTED IN PART.** Counts I, II and VI in Plaintiffs' First Amended Complaint dealing with the copyright claims remain but Counts III, IV, V, and VII in Plaintiffs' First Amended Complaint dealing with the patent claims are hereby **DISMISSED.**